Peter K. Stris (SBN 216226)
    peter.stris@strismaher.com
Brendan S. Maher (SBN 217043)
    brendan.maher@strismaher.com
Victor O'Connell (SBN 288094)
    victor.oconnell@strismaher.com
STRIS & MAHER LLP
725 South Figueroa Street, Suite 1830
Los Angeles, CA 90017
Telephone: (213) 995-6800
Facsimile: (213) 261-0299

*Attorneys for Plaintiff and
all others similarly situated*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LEQUITA DENNARD, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AEGON USA LLC, TRANSAMERICA FINANCIAL LIFE INSURANCE COMPANY, TRANSAMERICA RETIREMENT SOLUTIONS CORPORATION, KIRK BUESE, RALPH ARNOLD, KEN KLINGER, MARY TAIBER, DIANE MEINERS, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT** |

1.     Plaintiff Lequita Dennard individually and as a representative of a class of similarly situated persons brings this action on behalf of the AEGON Companies Profit Sharing Plan (the "Plan") against AEGON USA LLC ("AEGON"), Transamerica Financial Life Insurance Company, Transamerica Retirement Solutions Corporation, and the trustees of the Plan including Kirk

1 Buese, Ralph Arnold, Ken Klinger, Mary Taiber, and Diane Meiners (collectively

2 "Defendants").

3                              **NATURE OF THE ACTION**

4         2.      Billion dollar retirement plans like the Plan generate millions in

5 dollars of fees in a year for their vendors, and therefore have substantial

6 negotiating power to obtain lower plan fees. But AEGON, through its employees

7 and affiliates, not an independent fiduciary, manages the Plan to benefit itself, in

8 breach of its fiduciary obligations under ERISA, by burdening the Plan with layers

9 of superfluous fees paid to AEGON affiliates. The Plan pays fees far higher than

10 peers. These fees go overwhelmingly to AEGON which, through affiliates, serves

11 as the Plan record keeper and investment manager for the vast majority of Plan

12 assets.

13        3.      AEGON has placed many of its investment products in the Plan,

14 including at least sixteen AEGON-managed investments in collective trusts or

15 pooled separate accounts, each with a particular management objective such as

16 "Large Value" or "Core Bond." A collective trust or pooled separate account is a

17 commingled investment fund with multiple investors—much like a mutual fund

18 except that mutual funds register their shares and mutual funds are traded on

19 exchanges. Like mutual funds, collective trusts and pooled separate accounts

20 charge investment management and portfolio administration fees for managing the

21 securities in the portfolio.

22        4.      AEGON charges an investment management fee for the collective

23 trusts and pooled separate accounts in which the Plan invests. But the manager of

24 each collective trust and pooled separate account does not manage a portfolio.

25 Instead, each such commingled fund simply reinvests in an AEGON mutual fund

26 of the same asset class and strategy. In other words, the AEGON portfolio

27 managers for the Plan's investment option do not manage a portfolio even though

28 they charge a substantial investment management fee. Instead, they simply pick an

Stris &
Maher LLP

                                             2

underlying mutual fund. This has the effect of layering a superfluous and excessive investment management fee on top of the fees charged to the mutual fund. AEGON collects this superfluous fee.

5.      But AEGON does not stop there with superfluous fees. AEGON does not manage the portfolios of the underlying mutual funds. Instead, it hires subadvisors to manage the portfolios. Nevertheless, AEGON charges a substantial advisor fee merely for picking a subadvisor to do all the real work of portfolio management. Thus, AEGON imposes yet another superfluous fee on the Plan for its own benefit.

6.      Further, each subadvisor offers its investment management services directly to institutional investors such as retirement plans. Instead of contracting directly with subadvisors for portfolio management, AEGON and the Trustees it controls who determine Plan investment offerings selected AEGON investment products that offered the same portfolio management service provided by the subadvisors, but interposing layers of AEGON middle-men who charged layers of additional fees with no added value. The markup on subadvisor fees is often hundreds of percent. These excess fees are all at the Plan's expense.

7.      AEGON also has included its stable value fund in the Plan. The stable value fund has opaque fee structures and credits interest to investors solely at the discretion of AEGON. The wild swings in the crediting rate within a given year under the stable value fund demonstrate that the crediting rate is not tied to market performance, but, rather, to benefit AEGON where it sets the crediting rate arbitrarily and based on whatever spread it wants to collect between its return on investment and the crediting rate.

8.      AEGON acts as record keeper for the Plan. A record keeper for a plan is usually compensated in one of two ways, either with a per-participant fee or through revenue-sharing from the managers of investment options in the plan, in the form of a rebate of a portion of the management fee charged by that investment

Stris & Maher LLP

CLASS ACTION COMPLAINT

manager. The cost of record keeping is relatively inelastic in respect to the size of a plan, meaning that these costs increase modestly as a plan grows in number of participants and assets. In contrast, the revenue sharing payments are a percentage of assets and thus increase linearly as a plan grows. A plan operated in the best interests of participants will therefore require all revenue sharing payments that exceed the record keeping costs of the plan be rebated to the plan. This has become common practice among billion dollar plans. AEGON, though, did not make such an arrangement, meaning that the revenue sharing payments retained by AEGON exceeded reasonable fees by hundreds of thousands of dollars annually. This decision inured to the benefit of AEGON and harmed the Plan.

9.      The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., requires Defendants to act prudently and solely in the interest of the Plan's participants when making decisions about selecting, removing, replacing, and monitoring the Plan's investments and vendors, and acting to defray reasonable expenses of administering the Plan. Rather than fulfilling these fiduciary duties by offering Plaintiff and other participants in the Plan prudent investment options at reasonable cost, Defendants acted out of a conflict of interest and selected for the Plan and repeatedly failed to adequately monitor and remove or replace AEGON-managed investment products with bloated and superfluous management fees. Defendants also caused the Plan to pay, directly and indirectly, excessive Plan administration fees to AEGON.

10.     This is a civil enforcement action under ERISA, and in particular under ERISA §§ 404, 406, 409, 502(a)(2), 29 U.S.C. §§ 1104, 1106, 1109, 1132(a)(2). Plaintiff brings this action on behalf of the Plan for losses to the Plan and for disgorgement of unlawful fees, expenses, and profits taken by Defendants for the benefit of AEGON and themselves.

Stris &
Maher LLP

11.     This class action is brought on behalf of participants and their beneficiaries in the Plan who participated in the Plan from February 6, 2009 through the present ("Relevant Period").

**JURISDICTION AND VENUE**

12.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

14.     Venue is proper in this district under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §§ 1391(b)-(c) because, on information and belief, AEGON's principal place of business is in California, it administered the Plan in California, and it breached its duties to the Plan in California. Plaintiff is also informed and believes that Transamerica Financial Life Insurance is located in Los Angeles, California and that its breaches occurred there.

**PARTIES**

15.     Plaintiff Lequita Dennard is a resident of Georgia. She is a participant in the Plan.

16.     Plaintiff was not provided any information regarding the substance of deliberations, if any, of Defendants concerning the Plan's menu of investment options during the proposed class period. Plaintiff otherwise has no knowledge of the substance of the deliberations, or of the nature of the investments she selected in the Plan beyond what was provided to her by the Plan. Plaintiff discovered her claims shortly before commencing this action.

17.     AEGON USA, LLC ("AEGON") is a citizen of Iowa and a subsidiary of AEGON N.V., a multinational provider of insurance, and pension and asset management. AEGON also provides financial services including insurance, the management of retirement plans, and an array of investment options including

Stris &
Maher LLP

CLASS ACTION COMPLAINT

retail mutual funds and unregistered investment products such as pooled separate accounts and collective trusts. AEGON is the plan sponsor, serves as the plan administrator, and through an affiliate is the record keeper for the Plan. Transamerica Asset Management, Transamerica Financial Life Insurance Company, and Diversified Retirement Corporation now rebranded as Transamerica Retirement Solutions are subsidiaries of AEGON that provide investment management and other services to the Plan. AEGON is a fiduciary for the Plan because it established and administers investments held by the Plan. AEGON is also a fiduciary for the Plan because, through its Board of Directors, it appoints, monitors, and removes the Trustees of the Plan. AEGON maintains substantial operations in Los Angeles, including at 1150 Olive Street. Among other things, subsidiary Transamerica Life Insurance Company maintains its main retirement plan operations business in Los Angeles. Activities conducted in Los Angeles include: technical and strategic functions of AEGON as a service provider to retirement plans; product development, product pricing, and marketing development; and Investment Committee meetings where the Investment Committee for Transamerica Life Insurance Company makes investment product decisions.

18.     Transamerica Financial Life Insurance Company, in its own capacity or through one or more of its affiliates, is the manager of the pooled separate accounts in which the Plan invests and is the fiduciary for those separate accounts.

19.     Transamerica Retirement Solutions Corporation, and before that, Diversified Investment Advisors, both AEGON subsidiaries, managed the collective trust in which the Plan invests and acted as fiduciary for that collective trust.

20.     The Trustees of the Plan are appointed by AEGON's Board of Directors. The Trustees administer the Plan, select the investment options available under the Plan, and hire the service providers to the Plan. The Trustees are

Stris &
Maher LLP

responsible for monitoring Plan investments and vendors and have discretion to add or remove investment options offered in the Plan. The following individuals served as Trustees during some or all of the Relevant Period:

• Kirk Buese is an Executive Vice President – Private and Structured Finance at AEGON USA Investment Management, a subsidiary of AEGON N.V.

• Ralph Arnold is the Chief Risk Officer and a Director at Transamerica Premier Life Insurance Company, a subsidiary of AEGON.  He has been employed by AEGON, through subsidiaries and acquisitions, for more than 40 years.

• Ken Klinger is a vice president and actuary at Transamerica Life Insurance Company.

• Mary Taiber is an employee of Transamerica Life Insurance Company.

• Diane Meiners is an employee of Transamerica Life Insurance Company.

21.    Does 1 through 10 are persons unknown to Plaintiff, including but not limited to persons serving as Trustees, who were fiduciaries or parties in interest to the Plan during the Relevant Period.

## DEFENDANTS' ERISA VIOLATING CONDUCT

**I.    The Plan**

22.    The Plan is an "employee benefit pension plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

23.    The Plan is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

24.    The Plan covers eligible employees of AEGON and other participating employers, some or all of which are affiliates of AEGON.

25.    As of the end of the 2013 plan year, the Plan had 16,715 combined participants and deceased participants with beneficiaries receiving benefits.

26.    The Plan held $1.56 billion in assets at the end of the 2013 plan year.

Stris &
Maher LLP

27.     During the Relevant Period, the Plan has invested in the following funds: Employer Stock of AEGON N.V.; AEGON affiliate Diversified Retirement Corporation's collective trust Stock Index Fund and Real Estate Fund; AEGON affiliate Transamerica Financial Life Insurance Company's pooled separate account Core Bond Fund; High Quality Bond Fund; High Yield Bond Fund; Intermediate Horizon Asset Allocation Fund; Intermediate/Long Horizon Asset Allocation Fund; International Equity Fund; Large Core Fund; Large Growth Fund; Large Value Fund; Long Horizon Asset Allocation Fund; Mid Value Fund; Short Horizon Asset Allocation Fund; Short/Intermediate Horizon Asset Allocation Fund; Small Core Fund; and a Stable Value Fund; unaffiliated mutual funds Columbia's Acorn Z; Oppenheimer's Developing Markets Y and Developing Markets N; and Vanguard's Inflation Protected Securities Institutional Class and Small Cap Index Institutional Class. The Plan also offers a brokerage window through Charles Schwab. For all of its affiliated investment options other than AEGON stock, which together constituted more than 85% of Plan assets at the end of the 2013 plan year, AEGON charged investment management and other fees.

28.     The Trustees of the Plan, all of whom are employees of AEGON, decide to add to, maintain, or delete from these investment funds. The Trustees meet periodically to make these decisions, including within the last six years. For example, the Horizon investment options were removed from the Plan in 2012.

**II.     The Plan pays much higher fees to AEGON than is typical of peer plans.**

29.     Institutional investors, including mega plans with assets over $1 billion such as the Plan, have substantial bargaining power in the market for retirement plan investment products. Unfortunately for the Plan, AEGON kept the benefits of the Plan's bargaining power for itself, stacking layers of excess fees on top of the actual portfolio management service provided at low cost by a subadvisor.

Stris &
Maher LLP

30.     A prudent and loyal fiduciary for a mega plan uses the bargaining power of the plan to negotiate low fees from investment managers.

31.     The Plan has had more than $1 billion in assets since at least the end of the 2009 plan year. Defendants should have considered whether the Plan's investments and fee arrangements are suitable for a plan of such size.

32.     Mega plans, that is, plans with over $1 billion in assets, have a median asset-weighted total fee of 30 basis points, according to the BrightScope and Investment Company Institute publication *Defined Contribution Plan Profile: A Close Look at 401(k) Plans*, at 42, Figure 4.2, *available at* www.ici.org/pdf/ppr _14_dcplan_profile_401k.pdf (the "401(k) Report"). This includes investment management fees, administrative fees, and other fees such as insurance charges. A basis point is .01%, and is the industry's common term for expressing fees. Here, Plaintiff estimates that the Plan paid weighted average fees of over 160 basis points in each year of the Relevant Period on its investments in the AEGON separate accounts alone. This is triple the amount paid by $1 billion plans even in the 90th percentile of high fees reported in the 401(k) Report, and Plaintiff's estimate, unlike the 401(k) Report statistics, does not include additional insurance charges or administrative fees. Nor does it include fees charged by the Stable Value fund or the Diversified Collective Trust, which are opaque investment products with very little fee disclosure, as explained below. Had the Plan paid a weighted average fee of even 35 basis points a year during the Relevant Period, it would have saved more than $40 million in fees. Instead, those excess fees were collected by AEGON.

33.     The exorbitant fees paid by the Plan to AEGON are reflected in the Plan's investment returns, which are net of fees. According to a report generated by a service called Retirement Plan Prospector, as of year-end 2013, the Plan's five-year rate of return as compared to plans of similar asset size is -175.58%. The

Stris &
Maher LLP

CLASS ACTION COMPLAINT

Plan's 3-year return as compared to peer plans is -405.31%. This is the result of conflicted fiduciaries making decisions for a plan.

**III.   AEGON charged layers of fees while providing no service.**

34.   As of the end of the 2013 plan year, $684 million of Plan assets was invested among nine separate accounts managed by Transamerica Financial Life Insurance Company. These accounts have names indicating the type of asset class in which the account invests, such as Core Bond Fund or Large Growth Fund. During the Relevant Period, the Plan has included as many as fourteen of these separate accounts, accounting for as much as 47% of total Plan assets.

35.   A pooled separate account is a non-registered product offered by an insurance company, and resembles a mutual fund in that the assets of multiple investors are pooled to purchase securities, with differences in respect to the ownership structure of those investments.

36.   The Plan's separate accounts are not "managed" in furtherance of an investment strategy. AEGON affiliate Transamerica Financial Life Insurance Company, the advisor to these funds, is not picking stocks for the equity funds, or bonds for the bond funds. Instead, each separate account invests into an affiliated AEGON mutual fund, or in the case of the Horizon separate accounts several affiliated mutual funds, corresponding to the separate account's investment strategy.

37.   Nor do the advisors for these mutual funds actually manage the investment portfolio. Instead, each mutual fund advisor hires a subadvisor to manage the mutual fund portfolio.

38.   As set forth in Table 1, below, Plaintiff has identified the respective AEGON mutual fund and subadvisor for each of the Plan's separate account investments.

Stris &
Maher LLP

CLASS ACTION COMPLAINT

| Table 1 | | | |
|---|---|---|---|
| **Plan Investment** | **Analog Fund** | **Advisor** | **Subadvisor** |
| Stock Index Fund | NA | DRC[1] | Multiple |
| Real Estate Fund | NA | DRC | Multiple |
| Large Growth | DVEGX | TAM[2] | Wellington Management |
| Large Value | DVEIX | TAM | Aronson Johnson Ortiz |
| Core Bond | DVGCX | TAM | AEGON USA Investment Management LLC |
| International Equity | DIIEX | TAM | Thompson, Siegel & Walmsley |
| Small Core | DVPEX | TAM | Systematic Financial Management |
| Large Core | DVGIX | TAM | Aronson Johnson Ortiz |
| Mid Value | DIMVX | TAM | Thompson, Siegel & Walmsley |
| High Quality Bond | DIHQX | TAM | Merganser Capital Management |
| High Yield Bond | DIHYX | TAM | Eaton Vance Management |
| Long Horizon | DVLSX | TFLIC[3] | Multiple |
| Intermediate/Long Horizon | DVASX | TFLIC | Multiple |
| Intermediate Horizon | DVMSX | TFLIC | Multiple |
| Short/Intermediate Horizon | DVSIX | TFLIC | Multiple |
| Short Horizon | DVCSX | TFLIC | Multiple |
| Short Horizon | DVCSX | TFLIC | Multiple |

---

[1] Diversified Retirement Corporation

[2] Transamerica Asset Management, Inc.

[3] Transamerica Financial Life Insurance Company

11

Stris & Maher LLP

39.     Defendants permit this separate account arrangement even though an additional fee is added at the separate account level. These separate account level fees approach or exceed the mutual fund fee, even though Transamerica provides no service of value in exchange for these added fees. AEGON, though, benefits as it is the recipient of these excessive fees.

40.     Each of the subadvisors listed in Table 1 will contract directly with an institutional investor and manage a separate account for that investor. Defendants could have gone directly to the subadvisors rather than stacking an unwarranted separate-account level fee and mutual fund level fee and received the identical portfolio management service. Instead, Defendants decided that AEGON should benefit at the Plan's expense, with mutual fund fees that are multiples of the subadvisor fee, even though the mutual fund provides little or no services of value to the Plan in exchange for the fee stacked on top of what the subadvisor charges.

41.     For example, Aronson Johnson Ortiz, the subadvisor for the large value fund, publicly advertises investment management services for a large cap fund benchmarked against the Russell 1000 index, the same index benchmarked by the Plan's large value fund. Aronson Johnson Ortiz charges a management fee of 30 basis points on the first $250 million, decreased in three steps to 12.5 basis points on amounts over $1 billion.

42.     The Plan, though, pays a mutual fund fee of 45 basis points, well in excess of the 30 basis points or less charged by Aronson Johnson Ortiz. In addition to that 45 basis point fee, the separate account charges an additional 50 basis points. The result is a management fee charged to the Plan of 95 basis points, a markup of 217% on what was available directly from Aronson Johnson Ortiz. This markup is all for the benefit of the AEGON, at the Plan's expense.

43.     The same arrangement of excess management fees at the mutual fund level and separate account level is present in all of the pooled separate accounts in which the Plan invested, as listed below in Table 2.

Stris &
Maher LLP

12

| Table 2 | | | | | |
|---|---|---|---|---|---|
| **Plan investment** | **Separate account mgmt. fee** | **Mutual fund mgmt. fee** | **Total fee** | **Maximum subadvisor fee** | **Subadvisor markup** |
| Large Growth | .65% | .62% | 1.27% | .40% | 218% |
| Large Value | .50% | .45% | .95% | .30% | 217% |
| Core Bond | .40% | .35% | .75% | .12% | 525% |
| International Equity | .80% | .74% | 1.54% | .30% | 413% |
| Small Core | .85% | .80% | 1.65% | .425% | 288% |
| Large Core | .65% | .60% | 1.25% | .30% | 317% |
| Mid Value | .70% | .67% | 1.37% | .275% | 398% |
| High Quality Bond | .40% | .35% | .75% | .20% | 275% |
| High Yield Bond | .50% | .55% | 1.05% | .35% | 200% |
| Long Horizon | .29%* | .10% | .39%‡ | Multiple | Varied |
| Intermediate/ Long Horizon | .26%* | .10% | .36%‡ | Multiple | Varied |
| Intermediate Horizon | .26%* | .10% | .36%‡ | Multiple | Varied |
| Short/Intermediate Horizon | .26%* | .10% | .36%‡ | Multiple | Varied |
| Short Horizon | .26%* | .10% | .36%‡ | Multiple | Varied |
| * This value reflects a percentage calculated from the actual dollar value of fee as listed on the Form 5500, not the published management fee as provided to Plan participants in Plan disclosures. | | | | | |
| ‡ This amount is charged in addition to underlying fund fees. | | | | | |

44.    The actual markup may well be greater than listed above. Standard industry practice is that each subadvisor would agree that all assets of any existing registered investment company sponsored by AEGON to which the sub-advisor provides investment advisory services and which have the same investment mandate as the fund for which the fee is being calculated will be aggregated for purposes of obtaining best pricing. The Plan would have access to lower subadvisor pricing than the maximum rate listed in Table 2, above.

Stris & Maher LLP

13

45.     Subadvisors would readily have agreed to include the Plan in such an aggregation arrangement to acquire and keep AEGON's business. Thus, the Plan could have obtained the best fee terms available to AEGON had Defendants used the Plan's assets and bargaining power to the Plan's advantage. Instead, Defendants abdicated their fiduciary duties and allowed AEGON to reap millions of excessive fees from the Plan.

46.     The table above also understates the true fees paid by the Plan because it includes only the investment management and advisory fees. There are additional fees that may be paid at the mutual fund, separate account, or Plan level, including insurance charges and other administrative fees under the annuity contract.

47.     These tables also do not fully account for the Diversified Collective Trust investments held by the Plan, totaling approximately $226 million at the end of 2013. The nature of this investment and its fees are opaque. The Summary Plan Description describes this investment as two funds, a real estate and a stock index fund. But the Form 5500 financial report for the Diversified Collective Trust, EIN 04-6784256, Plan Number 001, tells a different story. According to that report, the Diversified Collective Trust holds corporate stocks, corporate debt, U.S treasuries, interests in other collective trusts, interests in mutual funds, and "other" investments. Indeed, according to the Form 5500, approximately 80% of the Diversified Collective Trust is simply invested in other pooled investment funds, mutual funds and collective trusts, managed by other investment managers who must also charge fees for managing those portfolios. DRC charged approximately 53 basis points to manage the Diversified Collective Trust, based on the Form 5500. This does not include any fees charged by the managers of the collective trusts and mutual funds that represent 80% of the assets in the Diversified Collective Trust. Thus, as with the other offerings, AEGON, through its affiliate, is stacking fees on top of fees on top of fees.

Stris &
Maher LLP

14

48.     This entire arrangement is a complete abdication of the Trustees' responsibilities to the Plan. It is the Trustees' job to select and monitor funds and managers. When they pick and maintain investment options that do nothing but invest in another manager's product they allow the Plan to pay unwarranted fees and effectively pay someone else to do the Trustees' job—someone affiliated with the Trustees' employer who charges exorbitant fees. If the Trustees believe the core investment management function provided by the sub-advisors is valuable to the Plan, they can and should contract directly with those sub-advisors and avoid the unnecessary and superfluous fees piled on by AEGON. They should not pay a manager to pick another manager. But the Trustees serve their true master (and employer) AEGON by maintaining arrangements that cost the Plan millions of dollars in superfluous fees that are pocketed by AEGON.

**IV.    Stable Value**

49.     The Stable Value Fund is a fund that invests in various income-producing securities, supposedly high quality bonds. The investment information provided to participants does not reveal any fees charged by the Stable Value Fund.

50.     Although AEGON may charge some undisclosed fees with the Stable Value Fund, it makes its real money on the spread between the interest rate it credits to investors and the returns it earns on the investments in the Stable Value Fund. Neither the spread nor the amount earned by AEGON is disclosed to participants in the Plan.

51.     AEGON has discretion to set the crediting rate and routinely sets the rate arbitrarily for its own benefit.

52.     Thus, the Stable Value Fund substantially underperformed benchmarks. Since inception in 1990, the Stable Value Fund experienced an annual return of 4.39% through 2010. During roughly the same period, the average annual return for stable value funds was 6.1%. Thus AEGON's Stable Value Fund has

Stris &
Maher LLP

15

1  underperformed its peers by approximately 28%, resulting in millions of lost

2  dollars for the Plan and its participants.

3      53.    Given that the crediting rate lies solely within the discretion of

4  AEGON, AEGON's decision to set a low crediting rate immured to its benefit in

5  the form of monies retained and harmed the Plan in the form of reduced returns.

6  **V.    Defendants caused the Plan to forego millions in revenue sharing**

7  **rebates improperly retained by Principal.**

8      54.    AEGON serves as record keeper to the Plan.

9      55.    It is common for an advisor to a mutual fund in which a plan invests

10 to pay the record keeper a share of its investment advisory fee, referred to as

11 "revenue sharing," to defray plan administration fees and expenses that would

12 otherwise be charged directly to the plan.

13     56.    Revenue sharing payments are expressed in terms of basis points.

14     57.    The amount of revenue sharing paid to a record keeper by an advisor

15 to a mutual fund depends on several factors. Advisors to actively managed funds

16 generally pay more revenue sharing than index funds. Many index fund advisors

17 pay no revenue sharing at all. Equity fund advisors generally pay more revenue

18 sharing than bond fund advisors.

19     58.    Participants in the Plan are provided little if any information about

20 administrative and record keeping fees. The Form 5500 for the Plan reveals that

21 AEGON subsidiary Transamerica Retirement Solutions receives indirect

22 compensation from Plan investments, but not the amount of such compensation.

23     59.    When a Plan uses AEGON as its record keeper and invests in an

24 AEGON fund, a percentage of the amount earned by the investment advisor to that

25 fund, AEGON, is transferred to the record keeper, again AEGON, to defray record

26 keeping and administrative expenses that would otherwise be paid directly to the

27 plan.

28

Stris &
Maher LLP

CLASS ACTION COMPLAINT

60.    Because the amount of revenue sharing is measured in basis points, the revenue sharing payments received by the record keeper increase in linear fashion as plan assets in the fund increase. But the costs of record keeping and other administrative services remain relatively constant. A prudent and loyal fiduciary seeks to recapture revenue sharing for its plan when revenue sharing payments exceed the reasonable value of record keeping services.

61.    When revenue sharing payments exceed the market rate for the value of record keeping services, a fiduciary is obligated to seek rebates to the plan for the excess amount.

62.    A plan fiduciary, in fulfilling its fiduciary duties to the plan, must consider how a plan's size can be leveraged to reduce record keeping costs.

63.    Thus, large plans, like the Plan, often negotiate revenue sharing recapture agreements. Under such agreements, the record keeper and the plan's fiduciaries agree to cap record keeping and administrative fees at a fixed amount, usually a per-participant dollar amount. To the extent that revenue sharing payments to the record keeper exceed the capped amount, the difference is rebated to the plan.

64.    The Plan has the ability to obtain among the most favorable revenue sharing recapture arrangements in the market for several reasons. First, the Plan is a large defined contribution plan, with more than $1.5 billion in assets as of the end of the 2013 plan year. A plan this size will typically generate millions of dollars in revenue sharing payments annually. Second, the Plan is heavily invested in AEGON investments, giving AEGON great incentive to provide favorable revenue sharing payments to the Plan to obtain and keep the Plan's business. Third, all but one of the AEGON and the large majority of the Plan's investment options are in actively managed investments, which generate high fees for the fund advisor and correspondingly high levels of revenue sharing.

Stris &
Maher LLP

CLASS ACTION COMPLAINT

65.     According to a recent survey by the NEPC, the median record keeping fee for plans with bundled service arrangements, such as the Plan here, was $86 per participant. *See* NEPC, *2014 Defined Contribution Plan & Fee Survey: What Plan Sponsors are Doing Now*, at 2 (October 2014) (the "NEPC Survey"), *available at* http://www.nepc.com/writable/research_articles/file/2014_10_nepc_2014_defined_contribution_plan_and_fee_survey-_what_plan_sponsors_are_doing_now.pdf. In contrast, where vigilant fiduciaries have negotiated a per-participant record keeping fee, the median fee is $50 per participant (and the median total plan expense ratio is 33 basis points—consistent with the afore-mentioned 401(k) Report). *Id*. Further, the Plans in the survey that adopt the per-participant model are, like the Plan here, billion dollar plans. *Id*. Assuming the Plan's record keeping fees are in line with the median for bundled services, the Plan is paying AEGON an extra $36 per participant as compared to peer billion dollar plans in the survey. As of the end of the 2013 Plan year, the Plan had 16,715 combined participants and deceased participants with beneficiaries receiving benefits. Assuming the $36 excess per-participant fee, the Plan paid AEGON an excess record keeping fee of approximately $600,000 in 2013 alone. This extrapolates to over $3 million in excess record keeping fees paid by the Plan and its participants to AEGON within the Relevant Period.

66.     Other findings in the NEPC survey show that the Plan is being administered for the benefit of AEGON and without taking advantage of the substantial bargaining power of a $1 billion plan:

•     Billon dollar plans favor per-participant fee record keeping arrangements rather than bundled arrangements because of transparency and lower costs. *Id.* at 1, 2.

•     Billion dollar plans use their bargaining power to obtain lower fees. *Id.* at 2.

1      •    Billion dollar plans increasingly are recapturing for the benefit of the

2  plan revenue sharing payments that exceed the per-participant record keeping fee.

3  *Id.*

4  AEGON does none of these things for its $1.5 billion Plan. Instead, it reaps the

5  excess fees for itself.

6      67.    AEGON is not permitted to charge its plan anything but its direct

7  costs in providing record keeping services to its plan. 29 C.F.R. § 2550.408b-2(e).

8      68.    Defendants breached their fiduciary duties by failing to negotiate for

9  revenue sharing recapture. This misconduct substantially enriched AEGON.

10      69.    Further, AEGON keeps any interest earned on cash proceeds from

11  liquidated participant accounts and uses that money to purportedly pay Plan

12  expenses. This interest, also called float income, is in addition to the revenue

13  sharing and other administrative fees collected by AEGON and further increase the

14  total fees collected by AEGON at the expense of its Plan.

15      70.    Additional evidence that AEGON is failing to administer its Plan

16  consistent with fiduciary obligations is found in the 401(k) Report. Insurance

17  company retirement products are generally marketed to and purchased by small

18  plans, not billion dollar plans. The 401(k) Report finds that insurance companies

19  provide record keeping services for about half of plans with under $10 million in

20  assets, but only for 7.9% of plans with assets over $1 billion. 401(k) Report at 35.

21  This is because large plan sponsors recognize that insurance company products are

22  generally too expensive for billion dollar plans.

23  ### ERISA FIDUCIARY STANDARDS

24  ### AND PROHIBITED TRANSACTIONS

25      71.    ERISA imposes strict fiduciary duties of loyalty and prudence upon

26  the Defendants as fiduciaries of the Plan. ERISA § 404(a), 29 U.S.C.§ 1104(a),

27  states, in relevant part, that:

28

Stris &
Maher LLP

CLASS ACTION COMPLAINT

1    [A] Fiduciary shall discharge his duties with respect to a

2    plan solely in the interest of the participants and

3    beneficiaries and —

4         (A)    For the exclusive purpose of

5               (i)    Providing benefits to participants and

6    their beneficiaries; and

7               (ii)    Defraying reasonable expenses of

8    administering the plan;

9         (B)    With the care, skill, prudence, and diligence

10    under the circumstances then prevailing that a prudent

11    man acting in a like capacity and familiar with such

12    matters would use in the conduct of an enterprise of like

13    character and with like aims;

14         (C)    By diversifying the investments of the plan

15    so as to minimize the risk of large losses, unless under

16    the circumstances it is clearly prudent not to do so; and

17         (D)    In accordance with the documents and

18    instruments governing the plan insofar as such

19    documents and instruments are consistent with the

20    provisions of this title and Title IV.

21    72.    ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.

22    ERISA § 405, 29 U.S.C. § 1105, states, in relevant part, that:

23    In addition to any liability which he may have under any

24    other provision of this part, a fiduciary with respect to a

25    plan shall be liable for a breach of fiduciary

26    responsibility of another fiduciary with respect to the

27    same plan in the following circumstances:

28

Stris &
Maher LLP

CLASS ACTION COMPLAINT

1           (1)    If he participates knowingly in, or

2       knowingly undertakes to conceal, an act or omission of

3       such other fiduciary, knowing such act or omission is a

4       breach; or

5           (2)   if, by his failure to comply with section

6       404(a)(1) in the administration of his specific

7       responsibilities which give rise to his status as a

8       fiduciary, he has enabled such other fiduciary to commit

9       a breach; or

10         (3)    If he has knowledge of a breach by such

11       other fiduciary, unless he makes reasonable efforts under

12       the circumstances to remedy the breach.

13     73.    Under ERISA, fiduciaries that exercise discretionary authority or

14 control over the selection of plan investments and the selection of plan service

15 providers must act prudently and solely in the interest of participants in the plan

16 when selecting investments and retaining service providers. Thus, "the duty to

17 conduct an independent investigation into the merits of a particular investment" is

18 "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings*

19 *Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996). As the Department of Labor explains,

20       [T]o act prudently, a plan fiduciary must consider, among

21       other factors, the availability, riskiness, and potential

22       return of alternative investments for his or her plan.

23       [Where an investment], if implemented, causes the Plan

24       to forego other investment opportunities, such

25       investments would not be prudent if they provided a plan

26       with less return, in comparison to risk, than comparable

27       investments available to the plan, or if they involved a

Stris &
Maher LLP

28

CLASS ACTION COMPLAINT

1            greater risk to the security of plan assets than other

2            investments offering a similar return.

3  DoL Ad. Op. No. 88-16A.

4      74.    Pursuant to these duties, fiduciaries must ensure that the services

5  provided to the plan are necessary and that the fees are reasonable:

6            Under section 404(a)(1) of ERISA, the responsible Plan

7            fiduciaries must act prudently and solely in the interest of

8            the Plan participants and beneficiaries both in deciding

9            … which investment options to utilize or make available

10            to Plan participants or beneficiaries. In this regard, the

11            responsible Plan fiduciaries must assure that the

12            compensation paid directly or indirectly by the Plan to

13            [service providers] is reasonable . . . .

14  DoL Ad. Op. 97-15A; DoL Ad. Op. 97-16A

15      75.    A fiduciary's duty of loyalty requires a fiduciary to act solely in the

16  interest of plan participants and beneficiaries. As the Department of Labor has

17  repeatedly warned:

18            We have construed the requirements that a fiduciary act

19            solely in the interest of, and for the exclusive purpose of

20            providing benefits to, participants and beneficiaries as

21            prohibiting a fiduciary from subordinating the interests of

22            participants and beneficiaries in their retirement income

23            to unrelated objectives. Thus, in deciding whether and to

24            what extent to invest in a particular investment, a

25            fiduciary must ordinarily consider only factors relating to

26            the interests of plan participants and beneficiaries in their

27            retirement income. A decision to make an investment

28            may not be influenced by [other] factors unless the

Stris &
Maher LLP

CLASS ACTION COMPLAINT

1     investment, when judged solely on the basis of its

2     economic value to the plan, would be equal or superior to

3     alternative investments available to the plan.

4     DoL Ad. Op. No. 98-04A; DoL Ad. Op. No. 88-16A.

5         76.   The Department of Labor counsels that fiduciaries are responsible for

6     ensuring that a plan pays reasonable fees and expenses and that fiduciaries need to

7     carefully evaluate differences in fees and services between prospective service

8     providers:

9     While the law does not specify a permissible level of

10    fees, it does require that fees charged to a plan be

11    "reasonable." After careful evaluation during the initial

12    selection, the plan's fees and expenses should be

13    monitored to determine whether they continue to be

14    reasonable.

15    In comparing estimates from prospective service

16    providers, ask which services are covered for the

17    estimated fees and which are not. Some providers offer a

18    number of services for one fee, sometimes referred to as

19    a "bundled" services arrangement. Others charge

20    separately for individual services. Compare all services

21    to be provided with the total cost for each provider.

22    Consider whether the estimate includes services you did

23    not specify or want. Remember, all services have costs.

24    Some service providers may receive additional fees from

25    investment vehicles, such as mutual funds, that may be

26    offered under an employer's plan. For example, mutual

27    funds often charge fees to pay brokers and other

28    salespersons for promoting the fund and providing other

Stris &
Maher LLP

23

1   services. There also may be sales and other related
2   charges for investments offered by a service provider.
3   Employers should ask prospective providers for a
4   detailed explanation of all fees associated with their
5   investment options.

6   Meeting Your Fiduciary Responsibilities (May 2004), *available at*
7   http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html.

8   77.   In a separate publication, the Department of Labor writes:
9   Plan fees and expenses are important considerations for
10   all types of retirement plans. As a plan fiduciary, you
11   have an obligation under ERISA to prudently select and
12   monitor plan investments, investment options made
13   available to the plan's participants and beneficiaries, and
14   the persons providing services to your plan.
15   Understanding and evaluating plan fees and expenses
16   associated with plan investments, investment options,
17   and services are an important part of a fiduciary's
18   responsibility. This responsibility is ongoing. After
19   careful evaluation during the initial selection, you will
20   want to monitor plan fees and expenses to determine
21   whether they continue to be reasonable in light of the
22   services provided.

23   * * *

24   By far the largest component of plan fees and expenses is
25   associated with managing plan investments. Fees for
26   investment management and other related services
27   generally are assessed as a percentage of assets invested.
28   Employers should pay attention to these fees. They are

Stris &
Maher LLP

24

1    paid in the form of an indirect charge against the

2    participant's account or the plan because they are

3    deducted directly from investment returns. Net total

4    return is the return after these fees have been deducted.

5    For this reason, these fees, which are not specifically

6    identified on statements of investments, may not be

7    immediately apparent to employers.

8    Understanding Retirement Plan Fees and Expenses (May 2004), available at

9    http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

10    78.    ERISA prohibits certain transactions with plans involving parties in

11    interest and fiduciaries because of their significant potential for and risk of abuse.

12    Specifically, ERISA § 406, 29 U.S. Code § 1106, provides as follows:

13    (a) Transactions between plan and party in interest

14    Except as provided in section 1108 of this title:

15    (1) A fiduciary with respect to a plan shall not

16    cause the plan to engage in a transaction, if he knows or

17    should know that such transaction constitutes a direct or

18    indirect—

19    (A) Sale or exchange, or leasing, of any

20    property between the plan and a party in interest;

21    (B) Lending of money or other extension of

22    credit between the plan and a party in interest;

23    (C) Furnishing of goods, services, or

24    facilities between the plan and a party in interest;

25    (D) Transfer to, or use by or for the benefit

26    of a party in interest, of any assets of the plan; or

27

28

Stris &
Maher LLP

25

CLASS ACTION COMPLAINT

1          (E) Acquisition, on behalf of the plan, of any

2     employer security or employer real property in violation

3     of section 1107 (a) of this title.

4          (2) No fiduciary who has authority or discretion to

5     control or manage the assets of a plan shall permit the

6     plan to hold any employer security or employer real

7     property if he knows or should know that holding such

8     security or real property violates section 1107 (a) of this

9     title.

10    (b) Transactions between plan and fiduciary.

11    A fiduciary with respect to a plan shall not—

12         (1) Deal with the assets of the plan in his own

13    interest or for his own account,

14         (2) In his individual or in any other capacity act in

15    any transaction involving the plan on behalf of a party (or

16    represent a party) whose interests are adverse to the

17    interests of the plan or the interests of its participants or

18    beneficiaries, or

19         (3) Receive any consideration for his own personal

20    account from any party dealing with such plan in

21    connection with a transaction involving the assets of the

22    plan.

23                    **CLASS ACTION ALLEGATIONS**

24    79.   Plaintiff brings this action on behalf of a class defined as:

25    All participants in the AEGON Companies Profit Sharing

26    Plan from February 6, 2009 to the present. Excluded

27    from the class are Defendants, Defendants' beneficiaries,

28    and Defendants' immediate families.

Stris &
Maher LLP

26

80.     Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

81.     The class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations. The Plan had over 10,000 participants and beneficiaries in every year of the Relevant Period, all of whom invested in at least one of the AEGON Funds during the Relevant Time period and all of whom suffered from the excessive plan administration fees charged by AEGON. The number of class members is so large that joinder of all its members is impracticable.

82.     Common questions of law and fact include:

•     Whether Defendants were fiduciaries responsible for monitoring and making decisions with respect to the investments in the Plan and services for the Plan;

•     Whether Defendants breached their fiduciary duties to the Plan by causing the Plan to invest its assets in AEGON Funds;

•     Whether Defendants breached their fiduciary duties to the Plan by causing the Plan to pay, directly or indirectly, record keeping and plan administration fees to AEGON and its affiliates and subsidiaries;

•     Whether the investment and service-provider decisions made by Defendants were solely in the interests of Plan participants and beneficiaries of the Plan;

•     Whether Defendants breached their fiduciary duty by failing to defray Plan expenses;

•     Whether the Plan suffered losses as a result of Defendants' fiduciary breaches.

83.     Plaintiff's claims are typical of the claims of the Class. She has no interests that are antagonistic to the claims of the Class. Plaintiff understands that

Stris &
Maher LLP

CLASS ACTION COMPLAINT

1 this matter cannot be settled without the Court's approval. Plaintiff is not aware of

2 another suit pending against Defendants arising from the same circumstances.

3       84.     Plaintiff will fairly and adequately protect the interests of the Class.

4 She is committed to the vigorous representation of the Class. Plaintiff's counsel are

5 experienced in class action and ERISA litigation.

6       85.     A class action is the superior method for the fair and efficient

7 adjudication of this controversy. Joinder of all members of the Class is

8 impracticable. The losses suffered by some of the individual members of the Class

9 may be small, and it would therefore be impracticable for individual members to

10 bear the expense and burden of individual litigation to enforce their rights.

11 Moreover, Defendants, as fiduciaries of the Plan, were obligated to treat all Class

12 members similarly as Plan participants pursuant to written plan documents and

13 ERISA, which impose uniform standards of conduct on fiduciaries. Individual

14 proceedings, therefore, would pose the risk of inconsistent adjudications. Plaintiff

15 is unaware of any difficulty in the management of this action as a class action.

16       86.     This Class may be certified under Rule 23(b).

17       •    23(b)(1). As an ERISA breach of fiduciary duty action, this action is a

18 classic 23(b)(1) class action. Prosecution of separate actions by individual

19 members would create the risk of (A) inconsistent or varying adjudications with

20 respect to individual members of the Class that would establish incompatible

21 standards of conduct for the Defendants opposing the Class, or (B) adjudications

22 with respect to individual members of the Class that would, as a practical matter,

23 be dispositive of the interests of the other members not parties to the adjudication

24 or substantially impair or impede their ability to protect their interests.

25       •    23(b)(2). This action is suitable as a class action under 23(b)(2)

26 because the Defendants have acted or refused to act on grounds generally

27 applicable to the Class as a whole, thereby making appropriate final injunctive,

28 declaratory or other appropriate equitable relief with respect to the Class.

Stris &
Maher LLP

28

1      •      23(b)(3). This action is suitable to proceed as a class action under
2  23(b)(3) because questions of law and fact common to the members of the Class
3  predominate over individual questions, and this class action is superior to other
4  available methods for the fair and efficient adjudication of this controversy. Given
5  the nature of the allegations, no class member has an interest in individually
6  controlling the prosecution of this matter, and Plaintiff is aware of no difficulties
7  likely to be encountered in the management of this matter as a class action.

8                              **CLAIMS FOR RELIEF**
9                          **FIRST CAUSE OF ACTION**
10     **(Breaches of the Duty of Loyalty in Maintaining Plan Investments)**
11                          (Plaintiff v. All Defendants)

12     87.    Plaintiff repeats and realleges each of the allegations set forth in the
13  foregoing paragraphs as if fully set forth herein.

14     88.    Defendants are bound by ERISA's duties of undivided loyalty and
15  defraying Plan expenses.

16     89.    Defendants violated each of these duties with respect to the following
17  proprietary investment products: the Stock Index Fund; Real Estate Fund; Core
18  Bond Fund; High Quality Bond Fund; High Yield Bond Fund; Intermediate
19  Horizon Asset Allocation Fund; Intermediate/Long Horizon Asset Allocation
20  Fund; International Equity Fund; Large Core Fund; Large Growth Fund; Large
21  Value Fund; Long Horizon Asset Allocation Fund; Mid Value Fund; Short
22  Horizon Asset Allocation Fund; Short/Intermediate Horizon Asset Allocation
23  Fund; Small Core Fund; and Stable Value Fund.

24     90.    They violated these duties by maintaining Plan investment funds to
25  benefit AEGON with layers of fees rather than by avoiding excessive layers of
26  separate account and mutual fund fees and by contracting directly with sub-
27  advisors and saving the Plan millions of dollars at AEGON's expense. Defendants
28  therefore breached their fiduciary duties under 29 U.S.C. § 1104(a)(1).

Stris &
Maher LLP

29

91.     As a direct and proximate result of these breaches, the Plan and class members lost millions of dollars in the form of excess fees.

92.     Pursuant to ERISA § 502(a)(2) and § 409(a), 29 U.S.C. § 1132(a)(2) and 29 U.S.C.§ 1109(a), the Defendants are liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by their breaches of the duty of loyalty.

**SECOND CAUSE OF ACTION**

**(Prohibited Transactions in Connection with the Assessment of Fees)**

(Plaintiff v. All Defendants)

93.     Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

94.     As Plan sponsor, AEGON and its subsidiaries are parties in interest.

95.     AEGON is a fiduciary to the Plan.

96.     AEGON engages in prohibited transactions each time it charged inflated management fees and withdrew and possessed Plan assets in respect to the following proprietary investment products: the Stock Index Fund; Real Estate Fund; Core Bond Fund; High Quality Bond Fund; High Yield Bond Fund; Intermediate Horizon Asset Allocation Fund; Intermediate/Long Horizon Asset Allocation Fund; International Equity Fund; Large Core Fund; Large Growth Fund; Large Value Fund; Long Horizon Asset Allocation Fund; Mid Value Fund; Short Horizon Asset Allocation Fund; Short/Intermediate Horizon Asset Allocation Fund; Small Core Fund; and Stable Value Fund.

**THIRD CAUSE OF ACTION**

**(Prohibited Transactions and Breaches of the Duty of Loyalty in Connection with Defraying Reasonable Expenses of Administering the Plan)**

(Plaintiff v. All Defendants)

97.     Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

Stris &
Maher LLP

CLASS ACTION COMPLAINT

98.    As Plan sponsor, AEGON and its subsidiaries are parties in interest.

99.    AEGON is a fiduciary to the Plan.

100.    Defendants are bound by ERISA's duties of undivided loyalty, including the duty of defraying reasonable expenses of administering the Plan.

101.    Defendants violated each of these duties and engaged in prohibited transactions by causing the Plan to pay AEGON millions of dollars in annual record keeping and administrative fees beyond the cost of such services. Each year of the Relevant Period, the Plan paid, directly or indirectly, in discrete, periodic transactions, millions of dollars to AEGON in excess record keeping and administrative fees because Defendants failed to bargain for and seek revenue-sharing rebates.

102.    Defendants knew or should have known that the Plan could have negotiated far lower administrative fees, but Defendants caused the Plan to pay, directly or indirectly, millions of dollars to AEGON for AEGON's benefit.

103.    As a direct and proximate result of these breaches of duty and prohibited transaction violations, the Plan paid millions of dollars in unjustifiably high administrative fees and suffered millions of dollars in losses thereby.

104.    Pursuant to 29 U.S.C. § 1109(a) and § 1132(a)(2), Defendants are liable to restore all losses suffered by the Plan resulting from the breaches of duty and prohibited transactions and disgorge all revenues received by AEGON and its subsidiaries from the fees paid by the Plan to AEGON and its subsidiaries, and Plaintiff is entitled to appropriate equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Dennard prays for relief as follows:

1.    A declaration that the Defendants breached their fiduciary duties;

2.    A declaration that the Defendants violated ERISA § 406 and participated in prohibited transactions;

Stris &
Maher LLP

CLASS ACTION COMPLAINT

3.     An order compelling the disgorgement of all fees paid and incurred, directly or indirectly, to Principal subsidiaries and affiliates by the Plan, including disgorgement of profits thereon;

4.     An order compelling the Defendants to restore all losses to the Plan arising from Defendants' violations of ERISA;

5.     An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

6.     Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's investments in AEGON Funds;

7.     An order certifying this action as a class action, designating the Class to receive the amounts restored or disgorged to the Plan, and imposing a constructive trust for distribution of those amounts to the extent required by law;

8.     An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

9.     An order awarding Plaintiff and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

10.     An order awarding such other and further relief as the Court deems equitable and just.


Dated: February 6, 2015                    STRIS & MAHER LLP

                                           /s/ Peter K. Stris
                                           Peter K. Stris

                                           *Attorney for Plaintiff and all others
                                           similarly situated*

Stris &
Maher LLP

CLASS ACTION COMPLAINT